**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                                                                Case No. 20-10054-JWB

COREY J. HALL,

        Defendant.

**MEMORANDUM AND ORDER**

This matter is before the court on Defendant's motion to suppress evidence.  (Doc. 22.)
The motion is fully briefed.  (Docs. 22, 23, 24, 28.)  The court held an evidentiary hearing on May
4, 2021 and took the matter under advisement.  For the reasons stated herein, the motion to suppress
is GRANTED.

### I. Facts

The court finds the following facts from the evidence presented at the May 4 hearing.  At
9:38 p.m. on March 31, 2020, a Wichita police dispatcher directed Wichita Police Officers Drake
Kreifels and Jessica Helwi to respond to a 911 caller reporting an incident at 900 N. Waco street
in Wichita.  The dispatcher initially indicated the reporting party called in about a "drive-by"
shooting at the Mid-Town Apartments at that address.  Subsequent dispatches reported a
suspicious character with a weapon, indicated there were shots fired, and mentioned Apartment B-
302.  The dispatcher said that across an alleyway from the reporting party, a man with a weapon,
possibly a revolver, went outside on a balcony and fired shots into the air.  Helwi radioed the
dispatcher to confirm there was no report of damage; the dispatcher confirmed that fact, stating

the reporting party said the shots were fired into the air.  The dispatcher subsequently stated that Apartment B-302 was the reporting party's apartment, and that the suspect would be in Building 4 in an unknown apartment.  The dispatcher conveyed that the reporting party indicated they could hear "arguing with other females"; that the suspect was a Black male, six feet, medium build, red t-shirt and blue jeans, was still in his apartment, and had fired four rounds into the air.

Officers Kreifels and Helwi arrived at the apartment complex and attempted to locate the reporting party and suspect's apartments.  The officers eventually found the building where Apartment B-302 was located, gained entry into a common area by pressing a doorbell/intercom button, and met with Stephanie Wheeler, who confirmed she was the person who had called in about the shots.  Wheeler went outside with the officers and pointed out the balcony from which she said the shots had been fired.  Wheeler's balcony faced east across an opening toward a balcony that faced west, where she had seen the suspect.  The officers did not ask whether she heard any arguments or female voices before the shooting.  They said they would be back to get information from her.  The officers proceeded to Building 4, the one pointed out by Ms. Wheeler, but its outer doors, which were located on the east side of the building, were locked.

The officers could not get in so Kreifels pushed every doorbell button for the building.  The building was a split-level construction, with a lower level partially below ground, a mid-level above ground, and an upper level above the mid-level. A Black male in a white shirt and white pants emerged from a mid-level apartment just up a short flight of stairs.  Speaking to the man through the glass door and windows, Kreifels tried to get him to open the door, saying it was an emergency.  The man appeared to Kreifels to be confused and possibly under the influence of something or mentally ill; he said something and held up a small piece of paper with something written on it.  He would not open the door.  Jamesia Sanon, a resident from the upper level, came

down and let the officers in, as the man in white retreated up the stairs back toward his apartment. As the officers followed Sanon to the upper level, they walked by the man in white standing in his doorway. Kreifels told him to go ahead and shut his door, to which the man said, "Oh, okay," and shut the door. The officers went to the upper level and spoke with Sanon, who said she had heard the gunshots and that they were close, but she had not heard any arguing. The officers asked about the layout of the apartments, attempting to figure out which one the shots came from and where the front door to that apartment was located. They went through Sanon's apartment to her balcony and were able to locate the suspect's balcony down one level and just to the south. Other officers located shell casings on the ground under the balcony of the suspect's apartment.

Officers eventually concluded the suspect's apartment was likely 4-204, the same one from which the man in white had previously emerged. Several officers gathered outside that apartment door, while others stood in the west-side parking lot watching through the glass door of the suspect's balcony. Officers on the balcony side reported they could see an individual inside. Officers knocked on the door and Officer Rick Pena announced it was the police. A man inside gave a muffled response, indicated he was using the bathroom, and after a brief delay opened the front door. The man, Defendant Corey Hall, appeared wearing only his underwear and an undershirt. He was the individual who had previously emerged from the apartment dressed in white. Pena asked if they could come in and talk; Defendant asked what about. When Pena explained the report of a disturbance, Defendant said there was no disturbance and that no one else was present. Defendant asserted more than once that he had just finished using the restroom. Pena repeatedly asked if they could come in and talk and make sure no one else was there, and asked why Defendant had a problem with that, but Defendant denied his requests, insisting that no one else was inside and that he didn't know anything about a disturbance or shots being fired. Pena

could smell an odor of alcohol coming from Defendant.  Defendant's speech was at times slurred, repetitive, and confusing.  Among other things, he claimed he had been told by the police to stay in his apartment for 14 days because he had the corona virus.  Defendant said he was ill with the corona virus and coughed a few times during the encounter.  The conversation continued for five or six minutes, as Defendant answered Pena's various questions, including questions about his name, height (5'6"), weight (180), social security number, and other information.  Defendant said he lived alone, denied owning or possessing any firearms, and said he had not heard any shots.  He suggested the neighbors to the south might be the ones the police were looking for.

While Pena talked to Defendant, Kreifels went back upstairs to talk to Sanon.  In answer to his questions, Sanon indicated Defendant was always talking to himself and that she did not know if he owned any firearms.  When asked about Defendant's visitors, Sanon indicated he had a girlfriend who was frequently "in and out" of the apartment, although Sanon glanced out a window to the parking lot and said she did not see the girlfriend's car there now.  When Kreifels asked if she had seen the girlfriend that evening, Sanon thought briefly before indicating she had seen her around five o'clock that evening.   Kreifels relayed the information to other officers. Sanon also said she had heard a total of three shots fired in succession.

After Pena obtained Defendant's name and information, Officer Richard Kuhnke used it to contact SPIDER, a Wichita Police Department database, and was informed that Defendant was "Signal 1" and "Signal 35," indicating he was considered armed and dangerous and a known violent offender.  Kuhnke informed Sgt. Brian Bachman, the supervisor on the scene.  Bachman had been in the west parking lot attempting to observe through the glass door of the balcony.  He could see the living room and kitchen and could see a Black male in a white tank top at the front door with the officers.  After learning of the SPIDER information, Bachman went to the officers

at the front door and told Pena they needed to "clear" the apartment.  Bachman testified he made the decision to enter the apartment out of concern that the person who fired the shots was hidden around a corner out of sight of the officers, noting that the man they could see was not wearing a red shirt and blue jeans, as reported by the 911 caller.  Bachman testified he was also concerned that the shooter may have been holding someone hostage in the apartment or there may have been someone hurt in the apartment.

After receiving Bachman's directive to clear the apartment, the officers directed Defendant to step out of the apartment.  Defendant stepped outside.  The officers entered with guns drawn and swept through the apartment.  There was no one inside.  They found a firearm sitting in plain view on a table in the living room.  The entry occurred about thirty minutes after officers had first arrived at the apartment complex.

Defendant was not arrested after the firearm was found.  The only crime he was suspected of at that point was a misdemeanor municipal offense of discharging a weapon within the city limits.  The officers ran a "Triple I" criminal history check but it indicated he had no felony convictions.  Due to the COVID-19 pandemic, the WPD had a policy or practice in place to only arrest people for offenses involving violence.

## II.  Analysis

The Fourth Amendment to the Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. AMEND. IV.  "Unreasonable searches or seizures conducted without any warrant at all are condemned by the plain language of the first clause of the Amendment."  *Payton v. New York*, 445 U.S. 573, 585 (1980).  Moreover, "[i]t is a basic principle of Fourth Amendment law

that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* at 586 (internal quotation marks omitted).

Although a warrant is ordinarily required for the search of a home, the ultimate test under the Fourth Amendment is reasonableness, meaning the warrant requirement is subject to reasonable exceptions. *Kentucky v. King,* 563 U.S. 452, 459 (2011). Circumstances can make a warrantless search reasonable when "there is compelling need for official action and no time to secure a warrant." *Missouri v. McNeely,* 569 U.S. 141, 149 (2013). In *Mincey v. Arizona*, 437 U.S. 385, 392 (1978), the Supreme Court said "the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." In *Brigham City, Utah v. Stewart,* 547 U.S. 398, 400 (2006), the Court added that police may enter a home without a warrant "when they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with injury." As applied in the Tenth Circuit, this safety exception has two requirements: 1) the officers must have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others; and 2) the manner and scope of the search must be reasonable. *See United States v. Najar,* 451 F.3d 710, 718 (10th Cir. 2006). The government invokes the exception in the instant case and argues that a Tenth Circuit case applying it, *United States v. Gambino-Zavala,* 539 F.3d 1221, 1225 (10th Cir. 2008), "is directly on point." (Doc. 23 at 5.)

To determine whether a law enforcement officer faced an emergency that justified acting without a warrant, the court looks to the totality of circumstances. *McNeely*, 569 U.S. at 148–49. After examining the totality of the circumstance here, the court concludes the government has not met its burden of showing that the officers had a reasonable belief that a person was within the apartment in need of immediate aid or that there was an immediate need to enter to protect the

6

safety of themselves or others.  It is true that at the time of entry the officers had reasonable grounds to believe three or four gunshots had been fired from Defendant's balcony.  Moreover, they had reason to believe Defendant lied to them when he said he had not heard the shots and did not know anything about a disturbance. They also had reason to believe Defendant was intoxicated or impaired and had some history of firearms and violence.  Despite this, a number of other circumstances undermined the reasonableness of any belief that an immediate entry into the apartment was required for the safety of the officers or others or to aid an injured person.  These circumstances include the following.

First, the only information the officers had indicated that the reported gunshots were fired up in the air from the balcony outside the apartment.  This information was initially provided by the dispatcher and confirmed by Officer Helwi in speaking with the dispatcher.  The officers also spoke directly with the 911 caller, Ms. Wheeler, upon arriving at the complex, but did not ask her further questions about the shots at that time. The only information the officers had thus indicated the shots were not directed at anyone and had not caused any injuries or damage.  According to the evidence at the hearing, shooting a firearm within the city limits is a misdemeanor offense.

Second, at the time of the entry, the officers had no information reasonably indicating there was an ongoing threat to life or limb, or that there was an injured person within the apartment in need of aid, such that it would have been impractical for them to seek a warrant.  The entry occurred about a half an hour after the shots were fired.  In the course of the officers' investigation, no evidence emerged of any argument or disturbance between people in the apartment either before or after the shots were fired.  The only information about an argument the officers had came from the dispatcher, who indicated the reporting party heard "arguing with other females."  The dispatcher provided no basis of knowledge, time frame, location, or explanation of the assertion

that Ms. Wheeler heard an argument, and the officers did not ask Wheeler about it when they first encountered her or at any time before entering Defendant's apartment.  Moreover, the officers were told by Ms. Sanon, who lived very close to Defendant's apartment, that she had not heard any arguing before the gunshots.  At the time of entry, the report of a prior argument was uncorroborated and not known to be connected in any way to the gunfire.

Additionally, the officers had no reasonable basis to believe Defendant's girlfriend was in the apartment or was injured or being held against her will.  The information officers gathered in their investigation indicated Defendant's girlfriend was last seen at the apartments more than four hours before the shots were fired.  Ms. Sanon, who lived just above and immediately adjacent to Defendant's apartment, said she had not heard arguing before the shots, she had not seen the girlfriend since 5:00 p.m., and she did not see the girlfriend's car in the parking lot. Additionally, the officers spent more than five minutes talking to Defendant at the door of his apartment and saw no signs of injury, disturbance, or other persons in the apartment.  As the officers talked to Defendant at the front door, they could see a bathroom and part of the entry area.  Officers in the back looking through the balcony door could see the living room and kitchen and saw no indication of anyone other than Defendant, whom they could see talking with officers at the front door, present in the apartment.  It is true the officers could not see all areas of the apartment, including the bedroom, but the mere *possibility* that Defendant's girlfriend (or someone else) *could be* in those areas of the apartment did not reasonably support the need for an immediate entry into the dwelling.  The officers had no information indicating the girlfriend was in fact present in the apartment or that she was injured or being held against her will. *Cf. Gambino-Zavala,* 539 F.3d at 1226 (investigation showed shots were fired inside an apartment and two cars belonging to the men who lived there were in the parking lot, suggesting the men were still inside the apartment).

With regard to the possibility that other persons might be in the apartment, again, the officers had no specific information indicating that was the case, but even if they had, the government cites no reasonable basis for believing that such persons posed an imminent threat to the officers or others.  The mere possibility that someone other than Defendant might be inside did not reasonably support a need to immediately enter the apartment.  Sgt. Bachman stated he was concerned by the fact Defendant's clothing did not match the dispatcher's description of the shooter as wearing a red shirt and blue jeans.  Bachman expressed concern that the person who fired the shots could be someone other than Defendant, and that the person could be in the apartment around a corner, out of sight of the officers, and able to ambush the officers at the front door.  But that possibility was unsupported by any specific information the officers saw, heard, or gathered in their investigation.  By the time the officers entered the apartment, it had been approximately a half an hour since the shots were fired.  The officers had spoken with Defendant at his door for more than five minutes without any incident or indication of other persons or an imminent threat.  Defendant was cooperative and answered their questions, although he refused to give the officers permission to enter the apartment, as he had a right to do.  Taken as a whole, the evidence does not support a reasonable belief by officers that there was an immediate need to enter the apartment to protect the lives or safety of others due to the possibility that someone other than Defendant was in the apartment and posed an immediate threat.

The *Gambino-Zavala* case cited by the government has some similarities to the present case but is ultimately distinguishable on its facts.  The information available to officers in *Gambino-Zavala* indicated that eight shots were fired *inside* an apartment, that several men lived in the apartment and were known to carry guns, and that although the man answering the door denied anyone else was present, the mens' cars were parked such that "one could not be moved

without moving the other, suggesting that the men were still inside the apartment." *Gambino-Zavala,* 539 F.3d at 1226.  By contrast, in the instant case the only known shots were fired up into the air from a balcony outside the apartment, such that the shots would not have injured anyone in the apartment, and there was no specific information indicating anyone other than Defendant was present in the apartment.  Similarly, the cases cited in *Gambino-Zavala* that allowed warrantless searches all involved some specific information that supported a reasonable belief by officers that someone inside a dwelling may well have been injured, including reports of gunfire where officers "saw multiple bullets holes in windows and inside walls and furniture," a report of "ongoing gunshots and arguing" at a house, a report of shots fired where officers "could hear noise in the house, but could not determine whether anyone was inside," and a report of gunshots inside a home where children were present upstairs. *Id.* (citing cases).

Fourth, the government has failed to show it was impractical under the circumstances to obtain a warrant before entering Defendant's apartment.  No specific evidence was presented relating to the time it would have taken to obtain a search warrant or why it would have been impractical under the circumstances.  The Tenth Circuit has recognized that "telephonic warrants … provide a mechanism by which officers can obtain quick judicial review of search warrant applications…." *Harmon v. Pollock,* 586 F.3d 1254, 1266 (10th Cir. 2009).  *See also* Fed. R. Crim. P. 41(d) (a magistrate may issue a warrant based on information communicated by telephone or other reliable electronic means).  It undoubtedly would have been a hindrance to seek a search warrant in these circumstances, "[b]ut the Fourth Amendment reflects the view of those who wrote the Bill of Rights that the privacy of a person's home and property may not be totally sacrificed in the name of maximum simplicity in enforcement of the criminal law." *Mincey*, 437 U.S. at 393.

The officers in this case were professional in their response, investigation, and treatment of witnesses and Defendant alike.  The ultimate decision to enter Defendant's apartment was obviously made for the salutary purpose of ensuring that no one possibly came to any sort of harm. "But when it comes to the Fourth Amendment, the home is first among equals. At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)).  *See also Payton*, 445 U.S. at 585 ("[T]he physical entry of the home is the chief evil against which ... the Fourth Amendment is directed." (internal quotation marks omitted)).  "[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton,* 445 U.S. at 590.  Because no warrant was obtained in the case, and the government has not shown the entry into the apartment was warranted by exigent circumstances, the court concludes the motion to suppress should be granted.

Defendant's motion seeks to suppress evidence of the firearm found in his apartment. (Doc. 22 at 6.)  Defendant has shown that discovery of the firearm was a direct product of the unlawful entry into his apartment.  The firearm and evidence of its discovery in Defendant's apartment will accordingly be suppressed.  *See Hudson v. Michigan,* 547 U.S. 586, 593 (2006) (until a valid warrant is issued, citizens are entitled to shield their persons, houses, papers, and effects from government scrutiny; exclusion of the evidence obtained by a warrantless search vindicates that entitlement).  Defendant's supplemental notice also asks for suppression of "all evidence and derivative information of the unlawful intrusion…." (Doc. 28 at 2.)  It is not clear what evidence this refers to but, assuming there is other evidence obtained as a result of the entry, the government will be required to show it is not tainted by the unlawful entry before such evidence

can be admitted.  *See Hudson,* 547 U.S. at 593 (exclusionary rule might not apply if evidence's connection to unlawful police conduct is too attenuated to justify exclusion.)

### III.  Conclusion

Defendant's motion to suppress evidence (Doc. 22) is GRANTED.  IT IS SO ORDERED this 11th day of May, 2021.

_____s/ John W. Broomes_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE